Will the clerk please call the next case? 2230124 W.C. Brian Borst, Appellant, by John Elisak, v. Illinois Workers' Compensation Comm'n, et al., Dow Chemical, Appalachia, by Nicole Wiesa. Mr. Elisak, you may proceed. 2230124 W.C. Brian Borst, Appallachia, by Nicole Wiesa. This case involves a workers' compensation claim with an injury manifestation date in 2012. Brian Borst is the petitioner appellant. He had worked for the respondent, Dow Chemical, for about 16 years at the time of this injury manifestation. Back in 2002, while working for a respondent, he started to have some back pain that resulted in him eventually having a lumbar fusion surgery in 2005. He was released to return to work after this fusion surgery in February of 2005, and he returned to work full duty for a respondent. He continued to work for another seven years when he began to experience a recurrence of his low back pain. The respondent sent him for an evaluation to the work clinic that referred him back to his original surgeon, Dr. Ahuja, for an evaluation with a work description. Dr. Ahuja evaluated him and returned him back to his job duties without restriction. He continued to treat with Dr. Ahuja, got a series of injections, did not really improve, and then Dr. Ahuja finally took him off work completely in April 26th of 2012, and then performed a revision lumbar fusion surgery shortly thereafter. He has not returned to work of any kind since that time, and his condition has deteriorated. He had a second surgery much later. Mr. Bors worked this entire time as a maintenance technician for Dow Chemical. I don't think that there's much of a controversy here as to what his job duties were. I think all of the witnesses agree, including the respondent's Section 12 examiner, that the work would be considered heavy labor. They have kettles, various, it's about a three to four acre plant with 20 buildings and a number of chemical kettles, chemical mixers, and pipes, and as a maintenance tech he would go out and maintain the pipes, maintain the kettles, replace the motors, the rotors that mix the kettles, and all this had to be done with hand carts and hand tools. There were no power tools allowed in the plant. The maintenance techs would service the kettles, take parts off, bring them back to a workshop. The parts that were removed were of various sizes and weights, blades, motors, from small to very large. The carts that were used to go out into the plant and bring things back to the workstation usually about 100 pounds up to 500 pounds that he would be required to push through the plant back to the workstation. There are myriad work duties that involved crouching, bending, lifting, significant physical activity. I think also the parties agreed that his work was not repetitive in nature. It varied day to day. He did not perform the same activities over and over again. I think all the parties agreed. Mr. Bourse made a claim for workers' compensation benefits. The first exam was on March 27th of 2013. Dr. Itkin was provided a work description by the respondent as well as exemplar videos which were put into evidence showing the maintenance techs using three to four foot long steel pipes or sorry steel wrenches to loosen pipes throughout the plant. Counsel, can I interrupt as long as you're on that topic? I had a question. Are the videos that Dr. Itkin viewed the same videos that were recorded by Gerard Burns? Yes. Thank you. And there is a separate issue. Those were not provided to the petitioner before Dr. Itkin's provided before the deposition as opposed to before the hearing at arbitration. What's your case? The case that I cited has to do with the disclosure of the and I don't have it. I'm sorry. I don't have the case for some reason. It's escaping me. Yeah, but the statute specifically says it has to be provided 48 hours I believe before the hearing. It doesn't say before the deposition. That's true, but the deposition is part of the hearing. The deposition is not part of the hearing until it's introduced as an exhibit at the hearing. That's when it becomes part of the question. You had the video more than 48 hours before the hearing, didn't you? We did, but it was after both. It was important for the doctor's depositions for their testimony and Dr. Itkin was not allowed to be cross-examined on what was shown in the video and Dr. Hoosier most importantly was not allowed to review the video also, which did become an issue in the decision by the commission. They took issue with his knowledge of the petitioner's work duties and having that video to review would certainly be important. However, I do believe that Dr. Hoosier had a very in-depth knowledge of the petitioner's job duties, which I can get to when that comes up. Did the commission deny relief to your client because it found that his behavior was not compensation because it found that his condition of ill-being was as a result of a pre-existing degenerative condition? To respond to that, I think it's both, but the reason that the commission found, there's no question that he had a condition, that he had a serious lumbar condition, and the commission found that his work duties did not contribute to that condition and so, therefore, it was purely degenerative in nature. So, there had to be some explanation for his condition. Work was not that explanation and so it was merely degenerative. The commission didn't go into any discussion about why it was degenerative versus not related to his work duties outside of discussing the repetitive nature of his duties. So, I cited the exact language that the commission used in their analysis and they pointed that the only thing that the commission discussed was the repetitive nature of petitioner's work duties. There was no other discussion of how his heavy work for the respondent could not have contributed or did not contribute to his condition and there was no discussion as to why or what factors or what was considered that would support it being only degenerative. I know you did cite, you put something in quotes, but I noticed from your brief in the appendix, you never gave us a copy of the arbitrary decision, you never gave us a copy of the commission's decision, you never gave us a copy of the circuit court's decision. The only thing you gave us in your appendix was a table of contents to the record on appeal. Doesn't 341 and 342 require you in an appeal, dealing in a workers' comps case, to give us the decisions of the arbitrator, to the commission, and the circuit court? I'm looking here because there was an issue about this. Your opponent supplied an appendix with all the documents you should have given us as part of your brief. Yes, that's true, and so I responded by amending the brief on appeal and the respondent had already provided the decisions by that point. Why weren't they provided with the original brief? That was an oversight by me. So going back to what is at the crux of this case is the commission's decision comes from Dr. Itkin's subsequent section 12 examination and report. And so Dr. Itkin performed an examination on March 27, 2013. He had extensive knowledge of the petitioner's job duties. He concluded that he could not say one way or another whether petitioner's job duties contributed or didn't contribute to his current condition and that petitioner's job was heavy labor and that it may have contributed to his current condition. That was his opinion at that time. The respondent sent the petitioner for a re-evaluation with Dr. Itkin. The only new record was a functional capacity evaluation and a handful of visit notes with Dr. Ahuja. It's important to note that Dr. Itkin in his initial report said, I would be happy to revisit my opinion if my understanding of petitioner's job duties was incorrect or wrong or there's some additional information about his job duties. That was not provided to Dr. Itkin. And yet, in his report of April 14, 2014, his examination was the same as a year ago. No explanation as to why there was a new exam. And Dr. Itkin now says that the petitioner's condition was not related to his job duties and specifically mentioned because they were not repetitive in nature. And so, this idea is now introduced into this case by respondent, not by petitioner, that the petitioner failed to prove that his job duties were repetitive in nature. That was never petitioner's claim, simply that he has a repetitive trauma injury that developed over the course of seven years, not that his job duties were repetitive or he had a repetitive use type injury. That was introduced through Dr. Itkin in this report by respondent. And then respondent refuted their own theory of petitioner's injury, that he was claiming a repetitive use injury, there was no repetitive activity, and therefore, he failed to prove that he had a repetitive use type injury. That was never petitioner's claim. In the commission decision, the commission basically followed respondent's argument, respondent's claim that they introduced into this case. The commission found that the petitioner, it's in the decision, not that it was obviously degenerative and not related to his job, but specifically that the petitioner failed to prove that his job was repetitive in nature. And they go on to discuss exactly why petitioner failed to prove that his job was repetitive in nature. There was no discussion of anything else, that his job duties were not of the kind that would contribute or aggravate a lumbar fusion. They didn't talk about whether he did enough lifting or bending or crouching. Mr. Lysak, your time has expired at this time. You'll have time in reply. Are there any questions, however, from the court at this time? I just wanted to ask, what would you say to those who would argue you're asking us to reweigh these doctors' opinions? I am not, well, first, I'm not asking for the court to reweigh the doctor's opinions, necessarily. I believe that the commission erred in requiring that the petitioner show that his job was repetitive in nature. That is not the law, and that is not petitioner's claim. And that was in error. I also secondarily believe that their decision was against the manifest weight of the evidence. And in that argument, I do, I would, if the commission, or I'm sorry, the court does not agree that the commission erred in their decision by making petitioner prove something that was not part of his claim, then I do believe that their decision is against the manifest weight of the evidence because they did not give sufficient analysis to Dr. Ahuja. They concluded that Dr. Ahuja did not have enough information about petitioner's job duties to form an opinion. That's against the manifest weight of the evidence. The petitioner had been treating with Dr. Ahuja. Dr. Ahuja performed the initial surgery back in 2005. The respondents sent the petitioner back to Dr. Ahuja with the job description specifically to determine whether he needed restrictions in his job duties. So when they concluded that he did not have sufficient information to make a decision that's against the manifest weight of the evidence. Further, in elevating the opinion of Dr. Itkin, the section 12 examiner, over the treating position, the commission ignored that Dr. Itkin initially had no opinion as to whether petitioner's job duties aggravated his condition. And he changed his opinion a year later without any reason for doing so. They didn't even discuss it, didn't mention it, didn't discuss it. And that's central to Dr. Itkin's credibility. It was simply ignored by the commission. And that certainly should have been considered in weighing his evaluation. Thank you. The commission's decision suggests that on your application for adjustment of claim, all of your applications indicated the nature of the injury was repetitive trauma. Is that correct or is it incorrect? That is correct. And what's the problem in this case is the conflating of a repetitive use injury and repetitive trauma under the Workers' Compensation Act. They're two different things. In Peoria-Bellwood, the court announced the recognition of a repetitive trauma injury, and it is simply an injury that occurs over time. A repetitive use type injury is a subspecies of a repetitive trauma, like a carpal tunnel or a cubital tunnel-type condition or an overuse type of injury. That is a repetitive use type injury, but that is not the only type of repetitive trauma under the Workers' Compensation Act. Repetitive trauma is simply something that happens over time. And the petitioner's claim in this case is that his lumbar condition was aggravated over a period of seven years, performing heavy physical labor, which involved a lot of use of his lower back, torquing, bending, lifting engine parts, lifting blades, not doing the same activity over and over, but doing these heavy duty work activities over the course of time. Well, I think we've gone way over here. You'll have time and reply in your argument. You've eaten up your reply, but we'll give you time and reply. Mr. Wiza, excuse me, is it Wiza? Wiza. Wiza, excuse me. Yes, that's okay. Can you hear me okay? Yes. Okay, great. Thanks. Good morning, counsel. May it please the court. Again, Nicole Wiza here on behalf of the appellee in this case, Dow Chemical. I'd like to just, in response to what counsel's brought forth, I would like to point out a few things. First of all, I think we can all agree this is an individual that has a, does have a longstanding degenerative progressive lumbar spine condition. You know, he actually had his first surgery for the lumbar spine in 1995. That was a discectomy to the lumbar spine, which took place before he started working at Dow. Counsel mentioned the 2005 fusion that did take place while Mr. Borst was working for Dow. But again, these applications are not in relation to a 2005 injury. There's no suggestion here that something happened between 96 and 2005 for him to need that initial fusion that took place. What he's claiming, and as Justice Hoffman pointed out, and I was going to as well, he filed three applications for dates of injury under a repetitive trauma theory for various states in 2012, April, June, and July. As counsel mentioned, the petitioner did go back to work. He worked after that fusion. He was able, fortunately, to do full duty, and it's about a nine-month period just before he April, May of 2012, where he says he's having worsening conditions. Now, as the record shows at that point, there's nothing specific or even really generalized discussion of the petitioner's work activities, nothing in the medical records that he says accelerated, worsened, or bringing him any issues or concerns that specifically brought him back in 2012. There's nothing in Dr. Ahuja's records to indicate something that was told to him that was triggering this worsening condition. Again, we know this is an individual that's already had two back surgeries. He's got a degenerative progressive disease. Counsel stated that there's really not controversy about the work that he does. Obviously, we all know what's at issue here is the phrase repetitive trauma, how that's analyzed. As counsel mentioned, the Bellwood case was obviously first to put that on the scene. We know that you can have an injury, either people call it repetitive-repetitive with the exact same activities every single day. We also all know that it can be a cumulative activities that you do at work. I would say under either condition, and I think we've seen that in all the cases that analyze repetitive trauma, that looking at the kind of work someone does, whether it varies, what it entails is extremely relevant, extremely important, not only from the medical standpoint and for our physicians to know that, and then as well as the commission, who obviously have a handle on a lot of the repetitive trauma theory. There was a lot of evidence that was obtained and submitted to show that while Mr. Borst, of course, did some heavy activities, there were lots of it in the record, there also were activities that he did on a day-to-day basis, which didn't involve heavy lifting. We're not looking at an individual that's claiming he did 500 pounds, 100 pounds of lifting all day long, every day. Things varied, and I think what we all know and have seen throughout the course of these repetitive trauma cases is that when you're able to interject or show that there's variance in the activities, that's how employers on a day-to-day basis try to vary activities to get away from having more work injuries because we know that if someone's doing the exact same activity over and over, you're going to go down much more of a path, of course, where medically speaking, that's going to become the trigger for either causing or worsening a condition. So I think in what the commission says and specifically where they state, I think they're covering all their bases, where they specifically state that the petitioner's actions were neither repetitive nor performed in such a manner as to cause and or aggravate the low back. So the commission, I think, being very well versed in this, looked at everything and said, okay, it's not repetitive per se, but also for all the things that he did, there's a couple of other things we got to look at. This gentleman had varying kinds of activities he did, the weights, the positioning that he had to do. Look at his timeline, right? The gentleman clearly had a very, pre-existing condition that's not disputed. Like I said, the job duties, and then we have to look at the medical opinions. And that's, I know, where council spent a lot of his time. Again, Justice Hoffman brought up exactly where I was going to kind of go here, that when you're in a repetitive trauma situation, the question is, was any of the work activity a cause or a contributing cause? But the petitioner has to prove that this wasn't solely from a pre-existing condition. In this case, there's nothing to refute, there was a pre-existing condition. We have a medical physician who reviewed all the medical records from the early on stages through, and the other thing here with Dr. Itkin that I do want to point out to counter where council was going, Dr. Itkin first saw this individual in 2013. He then subsequently followed along for about two years. It was through 2015, seeing him twice, preparing six reports. So a very large piece of this, and I think it actually gives credibility in what the commission was looking at to Dr. Itkin over Dr. Ahuja is that, at first he said, look, I know what I've seen up to date. We've got the multiple surgeries. He sees them in 2013 and yeah, he says, I need more information. I don't feel confident to make a complete decision in terms of causation at this point. What he sees over the next two years is that this individual stops working, that this individual continues to have a worsening condition while he's not working. Now that's something that Dr. Itkin points out, that's something the commission relies upon. I know council said that he didn't think that commission relied on anything, but just Dr. Itkin saying no repetition, but they look at the credibility of this petitioner. They look at the fact that he has complaints when he's not at work and that he in fact needed two surgeries after he stopped working in April of 2012. They look at the fact that this individual stated in one of his doctor appointments that he could do work at home without any complaints and he was fine. His subjective complaints to the legs only occurred while he was at work. Dr. Itkin discusses that in his deposition to say that somebody with this kind of progressive condition wouldn't only have those complaints while at work. That's going to occur throughout other activities you do. So that caused a question for the petitioner's credibility as well. And all this to just point out that I think the commission had a very comprehensive analysis. I think they looked at not only the medical records. I do not think that they solely relied on saying work activities were not repetitive. Was that a part of it? It was. That's similar to what the court did or what the commission did in the Williams case that I cited to in my brief, because that's a piece of the analysis. There was a lot there to look at, a lot to analyze. And I would also just like to point out that if we look at Dr. Ahuja's opinions, while he was the treating physician throughout, again, there's no causal opinions from him in 2005. He allowed the petitioner to go back to work, which says to me, actually, he knows what he's doing and he thinks that he's okay to do that work. It's not contributing to his condition. If it was, why would he keep him on full duty for so long, even after a fusion surgery? And then Dr. Ahuja says, he testified that he actually had nothing to do or wanted nothing to do with making a causal connection opinion. And around April, May, June of 2012, he actually referred the petitioner and suggested he go to a different position in order to seek out a causal opinion. And I think that's precisely also why the commission points out and takes some question with how come it takes until December of 2012 for the treating doctor to finally put the pieces together. If he's seen him this long and he's had this much involvement in his life, he doesn't put the pieces together and say that this is causally related to his work. He doesn't do that definitively until he's asked to. That occurs in the other piece on that is that Dr. Ahuja, when asked what specifically, if we're not talking repetitively, what specifically then correlates your opinion to his condition worsening because of work? He only relied on two things. He said on 55 pound lifting and bending into small spaces. And if you look at the information from petitioner and the medical records, that's never provided in the medical records. That's not given at the same time. There's nothing that shows contemporaneously those kinds of activities. It doesn't come together, right? These are opinions that were given in December. And I see why the commission takes pause and says, you know what, when I weigh those, when we weigh those against the opinions that were given by Dr. Akin, that his is more credible. And as we all know, the commission's right, you know, it's their job to weigh everything, to look at all of that and to judge the credibility. I would say that I think they were extremely extensive in looking at all aspects. I don't think that they left anything out. And I don't think that they specifically used one component, such as just repetitive nature of activities, to come to their conclusion on that issue. And just to touch on a couple issues, I know that council didn't get to, but you know, my brief does go into the remaining issues of manifestation date and that I don't believe any of the case law says one must be found by the commission, especially in this case where there was no accident, no causal connection. So in terms of that, I think the commission was not against manifest weight in not finding a manifestation date. As to the evidentiary issue, again, as I said in my brief, but there was nothing fronted by council other than the GEER argument. Again, the case in GEER simply said that if certain information needed to be provided based on the physician's opinions, council was very aware of what the opinions were going to be. And as Justice Hoffman pointed out, that it did not have something to do with the certain information being turned over prior to Dr. Itkin's deposition. And again, based on all those reasons, I do believe in Apelli's position that the commission was not against the manifest weight of the evidence or that there was nothing to do with it. So I would just ask for the commission decision to please be affirmed. Thank you very much for your time. Thank you, council. Questions from the bench? No? Thank you, council. Mr. Eliasic, you may reply. I hope you're you're mooted. There you go. In reply, the respondent is, again, introducing this idea that a repetitive activity is an element in every repetitive trauma claim. It is not. It was never claimed here. It's not part of what the petitioner is claiming. And that's not what was contemplated by the court in Peoria County Bellwood Nursing Home. Simply stated, it's where an injury has been shown to be caused by a performance of the claimant's job and has developed gradually over a period of time. The Williams case cited by counsel that the repetitive nature of the activity should always be considered. That's an incorrect interpretation of that case. The court never found that in that case where there was a similar injury to the one being claimed here, the petitioner chose to try to prove that his injury was related to repetitive activity. That was what petitioner was claiming was the cause of his injury. And the court found that the petitioner failed to prove a sufficient repetitive activity to show that the repetitive activity caused his injury. They also found that there were other reasons that he failed to prove that his condition was related to his work activity. Chief among them, one of his treating physicians gave an opinion that it wasn't. And he also had alcoholism and diabetes. And so that court, that case does not obligate any court to consider repetitive activities in every claim of repetitive trauma. Those are two different things. And this is where the respondent made the same argument to the commission and confusing the two is the problem here. And if you look at the commission's decision, I know that counsel for the respondent is kind of arguing that the commission considered other things about the nature of the petitioner's job duties. That's not in their decision. Their decision is where they say they conclude that the petitioner failed to prove that his job duties were repetitive or performed in such a way. Then they go on to go to talk at length about how petitioner failed to prove that his job duties are repetitive. If you read it together, that whole paragraph, it's very clear that that's what the commission found. The respondent interjected that basis for causation in this case, not the petitioner at no point in time. And to quickly talk about the credibility of Dr. Ahuja, there's a problem here because Dr. Ahuja is not an Illinois orthopedic surgeon. He is not familiar with Illinois workers' compensation law or anything like that. And to basically say that Dr. Ahuja was not credible because he didn't put in writing an opinion until he was convicted. Dr. Ahuja, like many treating physicians, their first thought is not, I have to help this person with their causation proof. Their first thought is to give someone treatment. And Dr. Ahuja was not familiar with what he would need to put in his records to establish that he believed that the petitioner's heavy duty lifting and crouching and pushing and that those would contribute to his condition. Lastly, I'd like to mention the manifestation date issue. The case law is clear that in a repetitive trauma case, a manifestation date has to be chosen. And there's more than one manifestation date. It is for the commission to decide what date is the appropriate manifestation date for a repetitive trauma injury because there isn't an accident. To claim that the commission can simply decide there are no, we can't decide any date. Um, there were multiple- Mr. Lysak, your time has expired on reply. Any questions from the court? Okay. Thank you. Well, thank you, counsel, both for your arguments in this matter this morning. It will be taken under advisement. The written disposition shall issue. And at this time, the clerk of our court will escort you out of our remote courtroom. Thank you both. Thank you. Thank you.